**Roy Lee DUNN, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Nos. 5567, 5697.**

Court of Appeals of Alaska.

Nov. 5, 1982.

Christine Schleuss, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Roy Lee Dunn was charged by indictment on February 15, 1980, with two counts of first degree robbery, one count of attempted first degree murder, one count of first degree assault, one count of third degree theft by taking, and one count of third degree criminal mischief. In the first count of the indictment, Dunn was charged with committing an armed robbery of a liquor store; the robbery was alleged to have occurred on January 16, 1980. The remaining charges, Counts II–VI, resulted from another liquor store robbery, committed on February 5, 1980.

After successfully moving to sever the first count from his indictment, Dunn was tried before a jury on the charges stemming from the robbery committed on February 5. A jury acquitted Dunn of attempted first degree murder and the lesser included offense of attempted manslaughter, but he was convicted of first degree robbery and assault, third degree theft, and criminal mischief. For these offenses, Dunn was sentenced to an aggregate term of fifteen years' imprisonment. Dunn later entered a guilty plea to the January 16 robbery charged in Count I of the indictment; he was sentenced to a prison term of six years, to be served consecutively to the sentences arising from the February 5 robbery. Dunn thus faces a total sentence of twenty-one years' imprisonment.

Dunn filed a timely appeal challenging both the validity of his conviction and the

propriety of his sentence on the charges relating to the February 5 robbery. He separately appealed the sentence imposed upon his guilty plea to the January 16 robbery. These appeals were subsequently consolidated. We affirm Dunn's convictions and remand this case to the trial court for additional sentencing proceedings, as set out below.

## I. FACTS

Dunn initially argues that he was unlawfully arrested and that a jacket seized at the time of his arrest was illegally searched. Thus, Dunn contends that the superior court erred in refusing to suppress evidence resulting from his arrest and from the search of the jacket. These arguments call for a review of the facts surrounding Dunn's arrest and the ensuing search of his jacket.

At approximately 3:15 p.m. on February 5, 1980, Roy Lee Dunn entered the Brown Jug liquor store located in the Athenian Village shopping center in Anchorage. He picked up several bottles of liquor, put them in a cardboard box on the checkout counter, and gave the clerk a one hundred dollar bill as payment. As the clerk explained her reluctance to take a large bill, Dunn grabbed a quart-size paper bag, displayed a handgun, and ordered the clerk to put all the money from the cash register into the bag. The clerk complied with Dunn's demand.

Anchorage Police Officer Stephen Verzal was on routine patrol in the vicinity of the Athenian Village shopping center at the time of the robbery. He was in uniform and was driving a patrol vehicle. As Verzal pulled into the Athenian Village shopping center's parking lot to turn around, he saw Dunn exiting the side door of the liquor store; when Dunn saw Verzal's patrol vehicle, he (Dunn) quickly returned into the store. Verzal, believing Dunn's actions were suspicious, decided to investigate. He parked his car in a position from which he could see both the front and side doors of the liquor store and radioed for a backup unit, describing Dunn as a "black male with a short Afro wearing a fatigue jacket." Verzal then got out of the patrol car. Dunn emerged from the front door of the liquor store and Verzal stepped out of his car. Verzal called for Dunn to come to him, but Dunn simply waved and continued on his way. Verzal then repeated his command, and Dunn complied. When Dunn reached Verzal, Dunn was ordered to turn around and place his hands on his head. Verzal initiated a pat down search of Dunn for weapons, reaching around Dunn's left side along his belt line. At this point, Dunn began to move his right hand off his head; Verzal warned Dunn not to move. The officer continued the frisk.

Evidence as to the sequence of events that followed is in dispute. Officer Verzal testified that Dunn suddenly retrieved a revolver with his right hand from the area of his belt and then turned around. Verzal stated that he grabbed Dunn's right hand, struggling for possession of the gun. According to Verzal, Dunn managed to bring the gun down and fire it up at the officer, hitting him in the abdomen. Despite this shot, the struggle for the gun continued. Dunn fired again, and the bullet from this shot struck Verzal in the chest, shattering a portable radio that he carried inside his jacket and knocking the officer to the ground. Verzal testified he heard two more shots. Of the final two shots, one bullet struck Verzal. According to Dunn, the struggle commenced when he attempted to surrender his revolver to Verzal. Dunn did not deny commission of the liquor store robbery, but he maintained that his gun accidentally discharged several times during the struggle with Verzal.

After the shooting, Dunn jumped into Verzal's patrol car and drove quickly away. Verzal, who was still conscious, managed to fire seven shots at Dunn before collapsing.

After a short distance, Dunn abandoned the stolen patrol car and fled on foot. Having left the patrol car, Dunn sought other transportation. He approached a nearby house and asked a young girl to use the telephone. Within several minutes, John Shelton, the girl's uncle, agreed to give

Dunn a ride. Dunn and Shelton then departed, with Shelton driving his white utility van and Dunn riding in the passenger's seat.

In the meanwhile, only minutes after the liquor store robbery, a police dispatch was issued indicating that an officer had been shot. Numerous Anchorage Police Department patrol units and Alaska State Trooper vehicles responded quickly, moving into the area around the shopping center. No formal road blocks were set up, but police officers and state troopers positioned themselves along almost every street in the neighborhood around the Athenian Village shopping center and carefully observed persons and vehicles traveling within the area or attempting to leave it.

Police broadcasts immediately following the shooting provided responding officers with the information that Verzal had been shot, as well as the description of Dunn initially given by Verzal to the police dispatcher. Officers were also initially given information that another person might have been involved as an accomplice. The second suspect was described only as a white male with blond hair driving a red van. Later in the investigation it was revealed that the second suspect was either an off-duty police officer who had come to Verzal's assistance immediately after the shooting or Michelle Stevens, a witness who had driven a red van rapidly away from the scene of the shooting immediately after it occurred.

Anchorage Police Sergeant George Boatright was one of the officers who responded to the dispatch that an officer had been shot. Prior to this dispatch, Boatright had heard Verzal's radio description of Dunn. As he drove toward the scene, Boatright heard over the police radio that the suspect had fled the shopping center in Verzal's patrol car. Shortly thereafter, Boatright learned that Verzal's car had been located near the scene of the shooting. Boatright positioned himself approximately seven blocks northwest of the liquor store and

shopping center. He elected not to station himself any closer to the scene of the shooting in order to allow for possible movement by the suspect after the shooting.[1] It took Boatright only several minutes after the shooting to reach the intersection that he selected.

Like other officers surrounding the scene of the shooting, Boatright did not establish a roadblock. According to Boatright, he anticipated no problem maintaining surveillance over traffic because, in his experience, motorists normally slowed down considerably when they observed a policeman alongside the roadway. Thus, Boatright expected that he would be able to obtain a good view of the occupants and the interiors of any vehicles passing by his location. As Boatright began observing traffic, he was aware that many other officers were performing the same role at other locations in the area around the shooting. Boatright specifically testified that, after learning the suspect had abandoned Verzal's patrol car, he was "looking for someone on foot or leaving in another vehicle." Although Boatright had heard the radio broadcast concerning possible involvement of a second suspect, his attention was focused primarily upon the description of Dunn that Verzal had personally broadcast immediately before the shooting.

Boatright was soon joined by another officer. At about that same time, several troopers stationed themselves a short distance to the west. After a short time, Boatright noticed John Shelton's white van approaching, westbound. Boatright observed that the driver of the van, Shelton, was a Caucasian male and that his passenger, Dunn, was black. As the van drew closer, Boatright noticed that Shelton repeatedly shifted his eyes from the road to the officers and then quickly back again. Shelton appeared to be quite nervous.

Boatright signaled for the van to stop, and he approached the driver. As he spoke to Shelton, Boatright could see that Dunn

---

1. Boatright testified that he did not stop closer to the scene of the shooting because "a few minutes had elapsed during my response, and an individual even on foot can ... can travel [a] considerable distance in a short period of time."

was wearing only a t-shirt but was perspiring heavily, with perspiration around the upper portion of the shirt; Dunn's pantlegs were wet up to the knees. Boatright also noticed a military fatigue jacket rolled up and placed next to Dunn's left leg, partially concealed between the passenger seat and the console of the van. Boatright asked Shelton what he was doing in the area, and Shelton replied that he had recently completed a job. This response bothered Boatright because Shelton's clothing, although consisting of normal work apparel, seemed to be neat and clean. While Boatright briefly engaged Shelton in conversation, he noted that Dunn continued to look straight ahead and did not at any time turn his head or look toward the officer. Dunn generally matched the description given by Verzal.

Sergeant Boatright concluded that Dunn was the suspect; in order to obtain a position on the passenger side of the van, he allowed Shelton to proceed down the road toward the state troopers. As the van approached the troopers, Boatright shouted to them to stop it; he quickly approached the passenger door with his weapon drawn and ordered Dunn to get out. Dunn was immediately taken to the rear of the van, searched for weapons and placed in handcuffs.

As Dunn was being taken into custody, Investigator Robert Clemens approached the passenger side of the van and saw the partially concealed fatigue jacket; he immediately removed it. Clemens searched the jacket for weapons and discovered a long, narrow paper bag, similar to bags commonly used in liquor stores, protruding from a pocket. After patting the bag and determining that it did not contain a weapon, Clemens opened it and found money stuffed inside, including several marked bills from the liquor store robbery. Dunn was then taken back to the liquor store, in custody, where he was positively identified by the clerk who had been robbed.

After Dunn's arrest on February 5, 1980, he was implicated in the prior liquor store robbery of January 16, 1980. His indictment and conviction followed.

## II. PROBABLE CAUSE TO ARREST

Dunn's arguments on appeal involving the lawfulness of his arrest and of the search that followed are integrally related. Dunn contends that the police did not have sufficient information to make a lawful arrest at the time he was ordered out of Shelton's van and placed in handcuffs. Consequently, Dunn argues, the search of his fatigue jacket and the bag containing the money was invalid and all evidence gained as a result of the arrest and search should have been suppressed. The state counters by asserting that there was ample probable cause to justify Dunn's arrest after Shelton's van was stopped for the second time. The state posits that, since Dunn's arrest was valid, the ensuing search of his jacket and the bag that was in its pocket was justified as a search incident to an arrest. Alternatively, the state contends that Dunn's initial detention was justified as an investigative stop and that the seizure of Dunn's jacket was action falling within the scope of the plain view and investigatory stop exceptions to the warrant requirement. The state reasons that, even without discovery of the stolen money, police had ample probable cause to arrest Dunn upon seizure of his jacket and observation of a brown bottle bag protruding from its pocket. Under this alternative theory, discovery of the bag thus provided probable cause for Dunn's arrest, which, in turn, justified opening the bag as a search incident to a lawful arrest.

In response to the state's alternative argument, Dunn concedes that police officers at the scene had sufficient information to justify an investigatory stop. However, Dunn insists that no investigatory stop was made and that he was arrested and placed in custody as soon as he emerged from Shelton's van, before the bag was discovered in his jacket pocket.

The issues raised by the parties were initially ruled upon by Superior Court Judge Eben Lewis. Judge Lewis denied suppression motions filed by Dunn, concluding that Dunn's arrest was effected with

probable cause and that opening of the bag containing money did not constitute a search. Because the superior court ruled against Dunn on the suppression issues, this court must consider the record in the light most favorable to the state. *Phillips v. State,* 625 P.2d 816, 817 n. 5 (Alaska 1980); *Gray v. State,* 596 P.2d 1154, 1158 n. 18 (Alaska 1979).

■ When the evidence is viewed in this light, we believe that it is sufficient to support the conclusion that probable cause for Dunn's arrest existed. Crucial to this determination is the definition of probable cause. AS 12.25.030(3) authorizes a warrantless arrest to be made by an officer "when a felony has been committed, and he has reasonable cause for believing the person to have committed it." In *McCoy v. State,* 491 P.2d 127, 130 (Alaska 1971) (footnote omitted), this statute was interpreted to mean:

> [A] peace officer, without a warrant, may arrest a person for a felony when the officer has probable cause to believe that a felony has been committed and probable cause to believe that the person committed it.

Under federal law, the concept of probable cause for arrest has traditionally been construed broadly, rather than restrictively. As held by the Court in *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949) (citations omitted):

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

"The substance of all the definitions" of probable cause "is a reasonable ground for belief of guilt." And this "means less than evidence which would justify condemnation" or conviction.

■ The United States Supreme Court's common-sense approach to definition of probable cause has consistently been followed in decisions of the Alaska Supreme Court. *See, e.g., McGee v. State,* 614 P.2d 800, 806 (Alaska 1980), *cert. denied,* 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 617 (1981); *Pistro v. State,* 590 P.2d 884, 886 (Alaska 1979); *Cruse v. State,* 584 P.2d 1141, 1144 (Alaska 1978); *Richardson v. State,* 563 P.2d 266, 268–69 (Alaska 1977); and *Erickson v. State,* 507 P.2d 508, 517 (Alaska 1973). Accordingly, it is well established that probable cause for arrest will exist when facts and circumstances known to a police officer would justify a man of reasonable caution in believing that an offense had been or was being committed and that the person to be arrested is the one who committed it. *Schmid v. State,* 615 P.2d 565, 574 (Alaska 1980).

■ The principal point urged by Dunn in arguing that he was arrested without probable cause is that the description of the suspect broadcast by Officer Verzal and relied upon by Sergeant Boatright was general, vague, and could have applied to large segments of the black community. A number of cases are relied upon by Dunn to support his position. *See, e.g., People v. Talley,* 34 Ill.App.3d 506, 340 N.E.2d 167 (1975); *Commonwealth v. Jackson,* 459 Pa. 669, 331 A.2d 189 (1975); *Commonwealth v. Richards,* 458 Pa. 455, 327 A.2d 63 (1974). While these cases generally affirm the proposition that vague and imprecise physical descriptions cannot establish probable cause for arrest, they are distinguishable from the circumstances in Dunn's case.[2]

---

2. *Commonwealth v. Jackson,* 459 Pa. 669, 331 A.2d 189, 190–91 (1975), involved a general description of two youths who had committed a robbery and killing. Following the incident, fifteen to twenty youths were arrested in the vicinity of the crime, based solely on their similarity to the general description. The defendant was one of those arrested and was taken into custody more than an hour after the crime, despite the fact that his clothing did not match the description of the suspect's that had been given. The defendant confessed to involvement in the crime after being arrested and was convicted. In reversing, the court in *Jackson* held that a general physical description, without more, would not support probable cause,

Dunn was described by Officer Verzal over the police radio simply as a "black male with a short Afro, wearing a fatigue jacket." This description was a general one and, indeed, might be applicable to a large segment of Anchorage's black community. This description, however, is not relied upon by Sergeant Boatright as the exclusive, or even the primary, basis for probable cause. Rather, it is merely one of several significant components implicating Dunn as the suspect. It is the totality of these factors that establishes probable cause.

Besides the fact that Dunn matched the general description broadcast by Officer Verzal, he was apprehended in a suburban area within a seven block radius of the scene of the crime while moving away from the scene; the arrest was made no more than twenty minutes after Officer Verzal was shot. Sergeant Boatright had good reason to believe that the suspect who committed the crime was still within its immediate vicinity, since numerous police units had responded to the report that an officer had been shot, and they had stationed themselves on the various roadways leading from the scene of the crime. Although no formal roadblocks were initiated, the police response was sufficient so that, according to the findings entered below, the scene of the crime was "effectively surrounded."

Other significant factors in addition to Dunn's similarity to Verzal's general description and his proximity to the crime scene indicated the likelihood that he was the perpetrator. Shelton's apparent nervousness while approaching Sergeant Boatright was manifested in the repeated shifting of his eyes from the roadway to police officers and back again. Dunn, on the other hand, fixed his gaze directly in front of him during the entire period that Shelton's van approached and while Sergeant Boatright conversed with Shelton. Thus, it appeared to Boatright that Dunn consciously sought to avoid directly facing the officers at the scene of the stop. Dunn contends that it was inconsistent for Boatright to say that his suspicions were aroused both by Shelton's frequent and rapid eye movements and by Dunn's fixed and unmoving gaze. However, we find no inconsistency. According to Boatright's testimony, Shelton's quick, repeated eye movements indicated his apparent nervousness, while Dunn's seeming unwillingness to move his head or establish eye contact with officers signalled a conscious effort to avoid the notice of the officers. There is nothing illogical about Boatright's opinion that Shelton was nervous and Dunn evasive. Nor was the opinion conclusory in nature. For these reasons, we think the superior court did not err in attributing significant weight to Boatright's observations.

Perhaps the most significant factors contributing probable cause are related to Dunn's physical appearance immediately prior to his arrest. At the time of the arrest, Sergeant Boatright was aware that the suspect had been involved in a physical struggle, had stolen Officer Verzal's patrol car and had subsequently abandoned it, presumably proceeding for at least some distance on foot through the snow. The temperature outside was between twenty-five and thirty degrees Fahrenheit. When Boatright observed Dunn in Shelton's van, Dunn was perspiring heavily, despite the cool temperatures outside. Dunn had on only a t-shirt above the waist, despite the fact that he had a military fatigue jacket with him. The fatigue jacket, which was consistent with Verzal's prior description, was situated in a manner that indicated Dunn's desire to conceal it from view. The fatigue jacket thus was consistent with the description of the suspect broadcast by Officer Verzal before he was shot. It also

especially when a significant period of time had elapsed between the crime and the arrest. Similar circumstances were involved in *Commonwealth v. Richards,* 458 Pa. 455, 327 A.2d 63, 67 (1974) where the court refused to find probable cause to arrest based solely on a general description; the defendant had been taken into custody several days after the crime. *People v. Talley,* 34 Ill.App.3d 506, 340 N.E.2d 167, 169–70 (1975) held only that a finding of probable cause could not be based solely upon an officer's conclusory statement that the defendant matched the description that had been broadcast of a criminal suspect.

provided cause for suspicion because Dunn had apparently removed it, despite sub-freezing temperatures. Finally, it provided additional cause for suspicion because it was apparently being hidden. Yet another significant aspect of Dunn's physical appearance was the fact that his pantlegs were wet. This provided Boatright with an indication that Dunn might recently have been on foot, walking or running through the snow.

The aggregate weight of all of the foregoing considerations is, we believe, fully sufficient to meet the established standard of probable cause. We think that, when the facts contained in the record are construed in the light most favorable to the state, a person of reasonable caution would have been justified in acting upon the belief that Dunn was the person who robbed the liquor store and shot Officer Verzal. Although it might be true, as argued by Dunn, that various factors, if taken individually, are as readily consistent with innocence as guilt, we believe that the main point to be made is that the factors did not occur individually, and in isolation from each other.[3] We thus hold that Sergeant Boatright had probable cause to place Dunn under arrest.

### III. PROPRIETY OF WARRANTLESS SEARCH

We must next consider the related question whether the warrantless search of the bag in Dunn's jacket was permissible. The state concedes that opening of the bag constituted a search. See Clark v. State, 574 P.2d 1261, 1264–65 (Alaska 1978). Because the search was warrantless, it must be con-sidered *per se* unreasonable unless it falls within one of the recognized exceptions to the warrant requirement. Erickson v. State, 507 P.2d 508, 514 (Alaska 1973). If the search does fall within a recognized exception to the warrant requirement, the superior court's order denying Dunn's motion to suppress may be affirmed as a matter of law, despite the superior court's mistaken finding that opening of the bag was not a search. See, e.g., McGee v. State, 614 P.2d 800, 805 n. 10 (Alaska 1980), cert. denied, 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 617 (1981); Pistro v. State, 590 P.2d 884, 888 n. 13 (Alaska 1979).

The state maintains that the seizure of Dunn's jacket and the inspection of the contents of the bag that protruded from the jacket's pocket can be justified under the exception permitting warrantless searches made incident to a lawful arrest. Dunn asserts that, even if his arrest was lawful, search of the bottle bag could not be permitted as a search incident to an arrest, since, when the bag was opened, any exigency arising from Dunn's arrest had already ceased to exist: he had already been arrested and handcuffed, the bag was outside the area reasonably accessible to him, and officers had determined, by patting the outside of the bag, that it did not contain a weapon.

A warrantless search incident to a lawful arrest is permitted to assure the safety of arresting officers and to avoid the possible destruction of evidence by the accused. See, e.g., Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685

**3.** Dunn also contends that the evidence does not support several findings relied upon by the superior court in deciding that probable cause existed. We do not find Dunn's points persuasive. For example, Dunn contends that an initial report (later determined erroneous) that the suspected robber might be involved with a caucasian male accomplice improperly added to Boatright's suspicion when he first saw Dunn and Shelton together. On this point, however, the record shows that Officer Boatright gave little if any significance to Shelton's presence and that his paramount concern was with Dunn's resemblance to the description given by Officer Verzal. Dunn further claims

that it was unreasonable for police to focus their efforts on traffic leaving the area of the crime, since the suspect was known to have abandoned Verzal's patrol car and had presumably continued on foot. Sergeant Boatright did not, however, testify that his efforts were exclusively directed at screening vehicle traffic. On the contrary, he indicated that he was looking for someone either on foot or in a vehicle. Considering that the suspect was known to have stolen and abandoned one vehicle, it was not unreasonable for Boatright to think it likely that the suspect might either steal another vehicle or commandeer a ride.

(1969). These dual policies justifying an exception to the warrant requirement for a search incident to arrest also serve to limit the scope of the warrantless search that can properly be conducted. *Id.* *See also McCoy v. State,* 491 P.2d 127, 132 (Alaska 1971). Thus, a warrantless search incident to arrest will normally be limited to the person arrested and the area within his immediate physical control. *McCoy,* 491 P.2d at 132.

Although the permissible scope of a warrantless search incident to an arrest is limited, these limitations are not inflexible. *United States v. DeLeo,* 422 F.2d 487 (1st Cir.1970), *cert. denied,* 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970); *McCoy,* 491 P.2d at 133.[4] In *McCoy,* the Alaska Supreme Court upheld the warrantless search of a foil packet found in McCoy's jacket pocket. Search of the jacket occurred at the police station, while McCoy was being interviewed, approximately thirty to forty-five minutes after his arrest. McCoy's jacket had been removed and draped over the back of the chair on which he was seated. In concluding that the warrantless search of McCoy's jacket and its contents was permissible as a search incident to arrest, the court expressly rejected McCoy's contentions that the search was too remote in time and place to qualify as a search incident to an arrest and that the scope of the search was impermissible because the foil packet was beyond McCoy's control at the time it was seized and opened. The court based its conclusions, in part, on the belief that an arrestee's reasonable expectation of privacy as to articles found on or about his person is slight, and therefore, the potential for abuse of constitutional guarantees intended to protect against unreasonable personal searches was greatly reduced. 491 P.2d at 136–38. Ac-

cordingly, the court adopted a four-part analysis for reviewing a claim that a personal search was justified as having been made incident to an arrest:

Adequate protection for the arrestee's legitimate interests in privacy, however, will be provided by the following restrictions on warrantless incidental searches of the person: (1) The arrest must be valid—probable cause for the arrest must exist or the search is unconstitutional. (2) The search must be roughly contemporaneous with the arrest. . . . (3) The arrest must not be a pretext for the search; a search incident to a sham arrest is not valid. . . . (4) Finally, the arrest must be for a crime, evidence of which could be concealed on a person.

491 P.2d at 138 (footnotes omitted).

The standards enunciated by the supreme court in *McCoy* have subsequently been applied to affirm searches of closed containers or articles carried on or about the person of the arrestee at the time of the arrest. *See, e.g., Hinkel v. Anchorage,* 618 P.2d 1069 (Alaska 1980), *cert. denied,* 450 U.S. 1032, 101 S.Ct. 1744, 68 L.Ed.2d 228 (1981); *Middleton v. State,* 577 P.2d 1050 (Alaska 1978). *But see Zehrung v. State,* 569 P.2d 189 (Alaska 1977), *modified on rehearing,* 573 P.2d 858 (Alaska 1978). It seems evident from these cases that, where the search involves articles carried on or about an arrested person, the articles searched need not be in the immediate presence and control of the arrestee when the search is commenced, nor is it necessary that other exigent circumstances exist at that time. Thus, in *Hinkel,* 618 P.2d at 1071, the court interpreted *McCoy* to hold that, "the exigencies of the search were to be judged at the time of the arrest rather than at the time the item is opened." [5]

A container on the person of an arrestee at the time of the arrest may be seized, opened, and searched as an incident to the arrest, . . . unless the container is too small to contain a weapon and the arrest is for a crime, such as reckless driving, for which no evidence could exist in the container. . . . This is so even though it is not strictly necessary to open a closed container found on the person of one who is arrested in order to protect the arrest-

---

**4.** As the Alaska Supreme Court stated in *McCoy v. State,* 491 P.2d 127, 133 (Alaska 1971), "the dual rationales underlying the exception for searches incident to arrest may serve to limit the physical area in which a warrantless search may properly be conducted, these rationales do not necessarily restrict time and circumstances of a permissible search."

**5.** The court in *Hinkel* further stated:

There is apparent tension between the line of cases that follow the supreme court's ruling in *McCoy* and other cases in which warrantless searches of closed containers seized from the defendant's immediate proximity at the time of his arrest have been found invalid. For example, in *Metcalfe v. State,* 593 P.2d 638 (Alaska 1979), a closed box was being placed by the defendant in the trunk of a car when he was arrested. The box was seized, transported to the station and searched without a warrant; the search disclosed a large quantity of marijuana. Relying on *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the Alaska Supreme Court held that the contents of the box should have been suppressed. The court adopted the ruling in *Chadwick* that

> Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

*Metcalfe v. State,* 593 P.2d at 640, quoting *United States v. Chadwick,* 433 U.S. at 15, 97 S.Ct. at 2485, 53 L.Ed.2d at 547. *See also Zehrung v. State,* 569 P.2d 189 (Alaska 1977), *modified on rehearing,* 573 P.2d 858 (Alaska 1978).

The seeming discord between cases such as *McCoy*—in which warrantless searches of closed containers seized at the time of the defendant's arrest have been approved—and cases such as *Metcalfe* and *Zehrung*—in which warrantless searches of closed containers seized under similar circumstances have been invalidated—was resolved by the Alaska Supreme Court in *Hinkel v. Anchorage,* 618 P.2d 1069 (Alaska 1980), *cert. denied,* 450 U.S. 1032, 101 S.Ct. 1744, 68 L.Ed.2d 228 (1981). In *Hinkel,* the defendant was arrested after running a red light and colliding with another car. After

the accident, she refused to get out of the car or to show her driver's license. When an officer tried to arrest her, she struggled; the officer was forced to drag her from the front seat of the car in order to effect the arrest. After Hinkel was placed in a patrol car, under arrest, her purse, which had been left in the front seat of her car, was removed by another officer and given to the arresting officer. The arresting officer opened the purse and discovered a loaded handgun. Hinkel was subsequently charged and convicted of carrying a concealed weapon.

On appeal, Hinkel argued that her purse, once secured by police officers and isolated from her immediate control, should not be opened without a search warrant. She analogized the purse seized from the inside of her car after she was placed under arrest to the box which was seized and later searched at the police station in *Metcalfe.*

Rejecting this analogy, the Alaska Supreme Court, after a careful review of state and federal cases dealing with the search incident to arrest exception, concluded that the line between permissible and impermissible searches of closed containers seized incident to a lawful arrest must be drawn according to the relationship of the container to the arrestee's person:

> The answer, we believe, is suggested by the language quoted from *Chadwick* in *Metcalfe,* . . . which pointedly excepts personal property 'immediately associated with the person of the arrestee' from the requirement that an exigency must exist to justify a search.
>
> This language must mean that containers found in clothing pockets must be searched. In our review it also suggests that containers such as purses which are often worn on the person and generally serve the same function as clothing pockets are also excepted from the strict exigency requirement. It would be possible, of course, to treat containers found in

ing officer from the use of a hidden weapon or to prevent the destruction of evidence. *Hinkel v. Anchorage,* 618 P.2d 1069, 1070 (Alaska 1980), *cert. denied,* 450 U.S. 1032, 101

S.Ct. 1744, 68 L.Ed.2d 228 (1981) (citations omitted).

clothes pockets, such as billfolds, differently from items such as purses which are not carried in pockets but serve the same purpose. However, we can think of no reasons to justify such a distinction. We conclude that Hinkel's purse was property immediately associated with her person and, therefore, was properly searched incident to her arrest.

*Hinkel v. Anchorage,* 618 P.2d at 1071 (footnote omitted).[6] *See also United States v. Berry,* 560 F.2d 861 (7th Cir.1977), *vacated on other grounds,* 571 F.2d 2 (7th Cir.), *cert. denied,* 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978).

The rule that emerges from the case law and that must govern the disposition of this case may be restated as follows: upon the lawful, non-pretextual arrest of an individual for a crime, evidence of which could be concealed on the person, a search of the arrestee's person, his clothing and articles which, akin to clothing, are immediately associated with the person of the arrestee may be searched at the time of the arrest, or within a reasonable period thereafter. As long as the search is confined within these limits, it is permissible for officers to open and inspect the contents of any closed containers found, unless, under the circumstances, it could not reasonably be believed that the container would yield a weapon or evidence of the crime for which the arrest was made. This rule is to be based on the relationship between the article searched and the arrestee at the time of the arrest, and must apply regardless of actual access to or control over the container by the accused at the time the search is initiated. Conversely, closed containers which are not, by their nature, immediately associated with the person of the arrestee, but which are merely seized from the arrestee's proximity at the time of his arrest, cannot be opened and inspected without a search warrant after they have been removed from the arrestee's control and secured by the police.

██ Applying this rule to the circumstances presented in this case, we must conclude that Investigator Clemens' warrantless search of the bag found in the pocket of Dunn's jacket constituted a permissible search incident to Dunn's arrest. Dunn was lawfully placed under arrest, based on the existence of probable cause; nothing in the evidence indicates, nor does Dunn suggest, that his arrest was a sham or a pretext to gain access to and search the contents of Shelton's van. Dunn's jacket was seized at about the same time his arrest was effected, and it was searched immediately upon seizure. One of the crimes for which Dunn was placed under arrest was armed robbery, and it is apparent that evidence of that offense, including the stolen proceeds, might be concealed on or about Dunn's person. The only significant question here is whether Dunn's jacket, by virtue of the fact that it had been removed and concealed between the passenger seat and the console of the van, falls within the definition of an item of personal property immediately associated with Dunn's person. We believe this issue must be resolved in the state's favor.

We perceive virtually no distinction between Dunn's placement of his jacket next to his left leg and the placement of a jacket over the back of a chair, as occurred in *McCoy.* In both instances, articles of personal clothing were involved, and they were in the immediate control of the arrestee at the time of the arrest. We do not think it significant that Dunn was being placed under arrest at the rear of the van when his

---

**6.** Thus, it is apparent that the distinction between cases such as *McCoy* and *Hinkel,* on the one hand, and *Metcalfe* and *Zehrung,* on the other, does not depend on the outward appearance of the seized container, as the ruling of the superior court appeared to imply. Cases decided by both the United States and the Alaska Supreme Courts indicate that the physical nature and appearance of the seized container is not determinative of whether it may be opened and searched. Under like circumstances, paper bags must be accorded the same protections against warrantless inspection as are closed and locked suitcases. *See, e.g., Robbins v. California,* 453 U.S. 420, 425, 101 S.Ct. 2841, 2845, 69 L.Ed.2d 744, 750 (1981); *Clark v. State,* 574 P.2d 1261, 1264–65 (Alaska 1978). *See also United States v. Ross,* —— U.S. ——, ——, 102 S.Ct. 2157, 2167–68, 72 L.Ed.2d 572, 587–89 (1982).

jacket was actually seized and searched. The circumstances are, in this respect, closely analogous to those of *Hinkel*. As in *Hinkel*, the exigencies of the search in this case must be determined with reference to the time that Dunn was initially ordered from the van to be taken into custody. As long as the jacket was in Dunn's immediate control as he sat in Shelton's van, it is not important that the jacket and its contents were first searched after Dunn was in custody and could not have gained access to the jacket.[7]

Dunn's jacket must be deemed to have been an article of personal property immediately associated with his person. The jacket was therefore subject to a search incident to Dunn's arrest, and officers conducting the search were authorized to open and inspect any containers found in the jacket which were reasonably capable of containing evidence of the crime for which the arrest was made. We conclude that the result reached by the superior court refusing to suppress the stolen money recovered from the bag found in Dunn's jacket must be affirmed, despite that court's reliance upon an inapplicable theory.[8]

## IV. PROSECUTOR'S COMMENTS

Dunn next attacks the prosecution's comments and elicitation of testimony before the grand jury indicating that, following his arrest, Dunn expressly asserted his constitutional rights to remain silent and to appointment of counsel. This situation arose when the prosecutor conducting grand jury proceedings, in the course of questioning the chief investigating officer in the case, affirmatively indicated that Dunn had given a partial statement to the police after he was arrested, but that his statement was terminated by Dunn's request for an attorney before disclosing any additional information. The officer's testimony confirmed Dunn's exercise of his constitutional rights.

There can be little doubt as to the impermissible nature of prosecutorial reference to assertion by the accused of his fifth amendment rights to remain silent and to appointment of counsel. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Dorman v. State*, 622 P.2d 448 (Alaska 1981). Such reference is inadmissible before the grand jury, just as it is inadmissible at trial. *See* Rule 6(r), Alaska R.Crim.P.[9] *See also Coleman v. State*, 553 P.2d 40, 50–51 (Alaska 1976); *Anthony v. State*, 521 P.2d 486, 496 n. 37 (Alaska 1974).

The state, on appeal, candidly admits the impropriety of the prosecutor's reference to Dunn's assertion of his fifth amendment rights. We share the views of both Dunn and the state as to the inadmissibility of this evidence. We believe that the prosecutor's reference to Dunn's assertion of his rights, as well as the testimony elicited before the grand jury by the prosecutor in this regard, is unprofessional and cannot be condoned. Nevertheless, we are bound in this case to assess the harm resulting from the prosecution's error by reference to the well-established test of whether

---

7. Dunn also attempts to distinguish his case from *Hinkel* on the basis that, in *Hinkel*, a weapon was involved, whereas here Investigator Clemens had determined, prior to initiating his search, that the paper bag in Dunn's jacket pocket did not contain a firearm. This argument is not persuasive. Neither *Hinkel* nor the line of cases which it analyzes and upon which its conclusion is based suggests that, in determining permissible scope of a search incident to arrest, a distinction should be drawn between searches for weapons and searches for evidence of a crime.

8. We note that an alternative basis for upholding the warrantless search of Dunn's jacket might be found by recourse to the automobile exception to the warrant requirement. The exception would appear to be applicable under the recent decision of the United States Supreme Court in *United States v. Ross*, —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Decisions of the Alaska Supreme Court, however, appear to adopt a more restrictive approach to the automobile exception. *See, e.g., Clark v. State*, 574 P.2d at 1264–65. In light of our finding that the search in the case was permissible as a search incident to Dunn's arrest, we express no view as to whether the automobile exception might independently apply.

9. Criminal Rule 6(r) provides, in relevant part:
Evidence which would be legally admissible at trial shall be admissible before the grand jury.

the outcome of the grand jury's deliberations was appreciably affected thereby. *Oxereok v. State,* 611 P.2d 913, 916 (Alaska 1980); *Coleman v. State,* 553 P.2d at 50. Despite the improper reference to Dunn's assertion of his fifth amendment rights, and despite the lack of any curative instruction to the grand jury in this case, we must conclude that the prosecution's error did not appreciably affect the grand jury's deliberation. The evidence against Dunn before the grand jury was exceptionally strong and included an eyewitness identification of Dunn by the liquor store clerk who had been robbed. Moreover, the grand jury was properly apprised of statements made by Dunn to police after his arrest in which Dunn admitted his presence at the liquor store at the time of the robbery, and, further, his involvement in the struggle with Officer Verzal that resulted in Verzal's shooting. We are convinced, upon review of the totality of proceedings before the grand jury, that the state's error must be deemed harmless.[10]

## V. UNIFORMED OFFICERS IN THE COURTROOM

Dunn further asserts that the superior court committed error in refusing to grant a protective order requiring guards who had custody over him during his trial either to remain out of sight of the jury or to appear in the courtroom out of uniform. The guards were required because Dunn was unable to post bail and was incarcerated during trial. Dunn's motion for protective order was denied by Superior Court Judge Ralph Moody, following a brief hearing. Throughout his trial, there were apparently two guards—members of the Alaska State Trooper Judicial Services section—present in the courtroom at all times; one guard was consistently placed in an alcove out of sight of the jury, while another sat in the public section of the courtroom. At various times, one or both guards appeared in uniform, including service revolvers; at other times they appeared in civilian garb.

Dunn does not contend that he was at any time exposed to members of the jury while he was under actual physical restraint or while the guards otherwise manifested direct physical custody or control over him. Nor does Dunn allege any particular acts or conduct on the part of the courtroom guards that might have resulted in jury prejudice. Instead, Dunn predicates his complaint upon the broad language of *Anthony v. State,* 521 P.2d 486 (Alaska 1974). In *Anthony,* the defendant, unable to meet the bail established by the trial court, appeared before the jury unshaven and in actual physical custody of a guard. Although the court reversed Anthony's conviction on other grounds, it addressed the issue of his appearance before the jury in the following terms:

> Aside from being allowed his own attire, defendant upon retrial should also be permitted to make himself clean and presentable. He should be allowed to shave and to shower before appearing in court. *In the courtroom, guards should remain outside the observation of the jury, and should deliver the defendant to the counsel table before the jury's arrival if necessary;* manacles, shackles and other physical restraints are, of course, to be avoided. Deviation from these standards is justified only to protect the safety and

---

**10.** We are not persuaded by Dunn's argument, based primarily on Chief Justice Boochever's concurring opinion in *Coleman v. State,* 553 P.2d 40, 53–54 (Alaska 1976), that the prosecution's improper references to Dunn's invocation of his rights constitutes a violation of due process requiring imposition of a more stringent standard of review. The question whether a defendant's constitutional right to substantive due process extends to grand jury proceedings is one that has not been squarely resolved under Alaska law, nor is it necessary for us to attempt a resolution here. This is not a case in which it could persuasively be argued that the prosecution made concerted efforts to influence the grand jury's deliberations by improper evidence, comment or involvement in the grand jury's deliberative process. *Cf. Johnson v. Superior Court,* 15 Cal.3d 248, 124 Cal.Rptr. 32, 539 P.2d 792 (1975). Assuming that a defendant's right to fundamental fairness under due process were extended to grand jury proceedings, we think that the single incidence of error here, standing alone, would not suffice to constitute a violation of that right.

decorum of the court, to prevent a threatened escape, or to respond to some other manifest necessity. Such measures should be taken only after the defendant has been given an opportunity for a hearing, and the restraints imposed should be the least intrusive which will accomplish the desired result.

521 P.2d at 496 (footnotes omitted) (emphasis added).

Dunn contends that *Anthony* equates the presence of uniformed guards within the observation of a jury, at any time during trial, with such restraints as shackling of a defendant or forcing him to wear prison attire. He maintains that the court's ruling allowing uniformed troopers to be present in the public area of the courtroom in and of itself violated his right to a fair trial and to the full protection of the presumption of innocence.

The state's response to Dunn's argument is to question whether *Anthony* should be read literally, that is, whether the language of *Anthony* indicating that guards should remain outside the observation of the jury must be extended to cover all uniformed officers present in the courtroom, regardless of whether they have actual physical custody of the defendant when observed by the jury. The state maintains that uniformed officers are routinely placed in courtrooms for security purposes in Alaska, that this is common knowledge, and that mere presence of uniformed officers in the public area of the courtroom during portions of Dunn's trial cannot logically be deemed to have informed the jury that Dunn was in custody. The state thus asserts that, when uniformed officers charged with maintaining custody over defendants during criminal trials conduct themselves in a manner consistent with the routine conduct of officers assigned to a courtroom for security purposes, the burden should be placed upon the defendant to establish specific instances of prejudice resulting from the police presence before the jury.

On balance, we believe the literal reading of *Anthony* urged by Dunn in this case to be too broad. As we have noted, the circumstances in *Anthony* involved a defendant in physical restraints and in the company of guards who had contact with and exercised actual physical custody over the defendant in the jury's presence. Cases relied upon by the court in *Anthony* similarly dealt with instances involving the appearance before the jury of a defendant in manacles, prison attire, or in the actual physical custody of prison guards. *See, e.g., Kennedy v. Cardwell*, 487 F.2d 101 (6th Cir.), *cert. denied sub nom. Kennedy v. Gray*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1973) (appellant's right to a fair trial was not violated when he appeared before the jury in the course of two trials shackled to a uniformed deputy sheriff). Moreover, Dunn has failed to call to our attention any cases decided since *Anthony* in which it has been held that the mere presence of uniformed officers in a neutral area of the courtroom, without any overt manifestation of actual physical restraint or custody, is sufficient to deprive the defendant of the right to a fair trial.

There is persuasive authority, however, to the contrary. For example, in *Hardee v. Kuhlman*, 581 F.2d 330 (2d Cir.1978), the defendant claimed that his constitutional right to a fair trial had been violated by the presence of armed guards in the courtroom. As in Dunn's case, the defendant's claim in *Hardee* was predicated solely on the presence of uniformed officers in a public area of the courtroom during his trial. The court of appeals rejected the defendant's claim, concluding that "Hardee's attempts to analogize the situation under which he was tried to the entirely different circumstances in the cited cases dealing with prison garb and shackling, fails." *Id.* at 332. In reaching this conclusion, the court relied upon three significant factors: (1) Hardee appeared in civilian garb; (2) the jury could be expected to have been aware that the presence of uniformed officers for security purposes in a courtroom during the course of a trial is a normal occurrence, and not unusual; and (3) there was no display in Hardee's case of actual custody or unnatural precautions. *See also Snow v. State,*

489 F.2d 278 (10th Cir.1973); *People v. Duran,* 16 Cal.3d 282, 127 Cal.Rptr. 618, 545 P.2d 1322, 1327 n. 8 (1976).[11]

In *Thomae v. State,* 632 P.2d 236, 241 (Alaska App.1981), we stated that, under *Anthony,* "the trial judge has a duty to make sure that courtroom security does not interfere with the presumption of innocence to which a defendant is entitled." We believe that, in assessing questions concerning the appearance before jurors of defendants who are incarcerated, our focus must be fixed upon a practical assessment of whether a defendant's treatment in the individual case would reasonably have led a jury to conclude that he was being held in custody, subjected to restraints or kept under a level of supervision indicating a belief on the part of the court in the defendant's guilt. For this reason, we do not believe that the supreme court's statements in *Anthony* pertaining to guards remaining out of the jury's view should be given the all-encompassing interpretation that would require a *per se* rule excluding uniformed officers from presence in the courtroom. Since courtroom presence of a limited number of uniformed officers or bailiffs for security purposes during criminal and civil judicial proceedings cannot fairly be deemed an unusual occurrence—one that would be unexpected to the average juror—, we do not think that similar, limited presence in public areas of the courtroom, by uniformed guards charged with a defendant's custody can realistically be deemed to convey or signal to the jury that the defendant is in custody, thereby eroding his presumption of innocence.

We conclude that the broad language of *Anthony* when read in the context of the factual circumstances involved in that case, as well as the holdings of the cases relied upon in *Anthony,* must be given a narrower interpretation than that urged by Dunn.[12] We think a fair reading of *Anthony* would indicate an intent on the part of the supreme court to preclude the appearance before members of the jury of uniformed officers or guards who are physically restraining a defendant or exercising actual custody and control over his person.[13]

The record in the present case fails to indicate the use of any restraint or direct physical control of Dunn by officers who remained in the courtroom during the trial. Similarly, there is no indication of unusual or extraordinary security precautions that might have conveyed to the jury that Dunn was in custody or that he was believed to be unusually dangerous. We therefore hold that Dunn's right to a fair trial was not infringed by the presence of uniformed officers during the course of his trial.

## VI. FAILURE TO EXCLUDE OFFICER VERZAL FROM THE COURTROOM

Dunn argues next that the superior court committed error in permitting Officer Verzal to remain with the prosecutor in the courtroom in the course of trial. This issue is addressed by Rule 615 of the Alaska Rules of Evidence, which states:

> At the request of a party the court may order witnesses excluded so that they

---

**11.** *Cf. People v. Johnson,* 54 Ill.App.3d 970, 12 Ill.Dec. 807, 370 N.E.2d 611 (1977) (presence of uniformed prison guards in a courtroom during defendant's trial was disapproved where uniforms were clearly emblazoned with the name of a state penitentiary in which defendant was held; the error was nonetheless found harmless).

**12.** The discussion of *Anthony* by the supreme court in *Ladd v. State,* 568 P.2d 960, 970 n. 15 (Alaska 1977), *cert. denied,* 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978) lends support to a narrow, rather than a broad, reading of *Anthony's* language concerning the presence of uniformed guards within the view of the jury.

**13.** Indeed, if the broad reading of *Anthony* argued by Dunn were adopted, it would follow that uniformed bailiffs and officers involved exclusively with routine courtroom security duties would always be precluded from appearing within view of a jury, whether a defendant was in custody or not. Courtroom presence of uniformed officers might as easily convey to the jury a mistaken impression that a defendant is in custody when he in fact is not, as it might convey a correct impression that a defendant incapable of posting bail is in custody.

cannot hear the testimony of other witnesses, and it may make the order on its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be important to the presentation of his cause.

Under the provisions of this rule, it is within the sound discretion of the trial court whether to permit a police officer involved in the investigation of the case to remain in the courtroom during the testimony of other witnesses. Exercise of the court's discretion will not be disturbed on appeal absent a clear showing of abuse. *See, e.g., Palmer v. State,* 604 P.2d 1106 (Alaska 1979); *Dickens v. State,* 398 P.2d 1008, 1009 (Alaska 1965).

 Dunn asserts that Officer Verzal's presence in the courtroom during trial was not justified because Verzal was not the state's chief investigating officer. Thus, Dunn points out that Investigator Ronald Rice was identified as the chief investigating officer in the case and had previously been designated to remain in the courtroom with the prosecutor during various omnibus hearings that had been held in the case. We note, however, that Evidence Rule 615 contains no express requirement that the officer permitted to remain with the prosecution during trial be designated the chief investigative officer; nor does Rule 615 require designation of the same officer for pretrial hearings and for trial.

The central issue at Dunn's trial was whether the shooting of Officer Verzal by Dunn was intentional or accidental.[14] While the state's chief investigating officer could certainly have been expected to be of greater assistance than Officer Verzal on the types of pretrial issues that were the subject of testimony during the omnibus

hearings, Officer Verzal was obviously more capable of assisting the prosecutor in matters pertaining to the altercation that resulted in his having been shot. In this regard, we note that, throughout the course of trial, Officer Verzal was called upon on numerous occasions to demonstrate, for illustrative purposes, the manner in which his contact with Dunn was initiated and the way in which the ensuing struggle and shooting occurred.[15] Under the circumstances presented, we conclude that Officer Verzal's continued presence in the courtroom throughout trial was authorized under Evidence Rule 615(2) and (3), and we hold that the trial court's ruling permitting his presence in the courtroom did not constitute an abuse of discretion.

## VII. JURY REQUEST FOR TRIAL TAPES

A further claim of error raised by Dunn relates to the trial court's handling of a request by Dunn's jury for tape recordings of the trial testimony of a number of the principle witnesses who testified. After about two hours of deliberation, Dunn's jury sent a written request to the judge stating, "we would like to have tapes of Michele Stevens, Officer Verzal, also LeRoy Dunn's [sic], Thomas Wilson, and Janet VanGieson." After discussing the matter with counsel, the trial judge, Seaborn Buckalew, called the jury to the courtroom and instructed them as follows:

> I've gone over your message with counsel, and I've arrived at this decision. I'm going to instruct you to go back and deliberate further and see if you can resolve whatever problems you have with the named witnesses. And if in a reasonable amount of time you still have a pressing problem, then we'll play the testimony back of the witnesses you want to hear. You have to understand that the playback will have to be here in court. I

---

14. At trial, Dunn admitted his involvement in the liquor store robbery of February 5, 1980. His defense thus centered upon the contention that the shooting of Officer Verzal occurred accidentally, in the course of a struggle.

15. The defense objected to Verzal's demonstrations on only one occasion. This objection was overruled, and Dunn has not contended on appeal that the trial court's ruling was in error.

don't know whether you got the idea you could take the tape in to the jury room. But if you can't resolve whatever problem you have within a reasonable amount of time, . . . we'll play them back in whichever order you want to hear them. So, I'm going to send you back for further deliberations and hope that it's productive. But I'll be here so you can get ahold of me. Just send me a message.

Judge Buckalew's instruction to the jury was given over the protest of Dunn, who contended that the court should have played the requested tapes to the jury. The jury subsequently returned verdicts against Dunn, without further requests for playback. On appeal, Dunn argues that failure to allow the jury to listen to the tapes that they requested constitutes reversible error.

It is well settled that the question whether to replay testimony to the jury is within the sound discretion of the trial court. *See, e.g., Dixon v. State,* 605 P.2d 882 (Alaska 1980); *Ripley v. State,* 590 P.2d 48 (Alaska 1979); *Cox v. State,* 575 P.2d 297 (Alaska 1978). The scope of discretion permitted to the trial court has, however, been narrowed somewhat by decisions of the Alaska Supreme Court. It seems evident that the policy in Alaska favors allowing the jury to listen to portions of recorded testimony when there is doubt or disagreement, and a reasonable jury request for a playback should not normally be declined in the absence of compelling reasons. *See, e.g., Dixon,* 605 P.2d at 887–89. Here, Dunn urges that the jury's request to hear taped testimony of five key witnesses at trial was not unreasonable, in light of the importance of the testimony given by the witnesses and the relative length of the trial. Dunn further maintains that there was no good reason to deny a replay.

In opposition, the state, while it concedes that reasonable requests for playback should generally be granted and that a trial court's authority to refuse a playback is somewhat circumscribed, urges that Judge Buckalew's action in this case was fully justified because the communication that he had received from the jury was not a request for playback, but rather a request to allow the jury to have physical custody of taped testimony for their use during deliberations in the jury room. A reading of the jury's request indicates that it was, indeed, ambiguous. The jury did not ask to listen to taped testimony of witnesses; rather, it indicated a desire "to have tapes" of the listed witnesses. Given the fact that the jury had been deliberating a very short period of time, coupled with the fact that its request encompassed the testimony of virtually all key witnesses testifying with respect to the assault charge, we think it likely that the jury's written communication did in fact reflect a mistaken belief by the jury that they could have the taped testimony made available for their use in the jury room during deliberations, as the need might arise.

It is apparent from a review of the record that the trial judge construed the jury's request in this manner. It is further clear from the record that the court's decision not to grant an automatic replay of the various witnesses listed in the jury's request was made because of the distinct possibility that the jury did not actually intend to request a playback or actually want one.

 In light of the ambiguity as to whether the jury was actually requesting a playback, and, further, given the broad scope of testimony encompassed in the request and the short period of time during which the jury had deliberated before making its request, we think that the trial judge's decision was well within the ambit of his discretion. Contrary to Dunn's claim, we do not find that the instruction given by the court to the jury in response to its request can reasonably be interpreted to discourage the jury from making a further request for a playback. When read in its entirety, the court's instruction sufficiently indicated that if members of the jury did have a disagreement or question over the testimony of any witness, the court stood ready to grant a request for a replay. No reluctance to replay testimony was implied by the court, nor did the court seek to impose restrictions on how much testimony

the jury could hear or replay. We hold that the court did not abuse its discretion in refusing to order a replay in response to the jury's original request.

## VIII. THEFT BY TAKING CONVICTION

The final challenge by Dunn to his convictions involves only the convictions and sentences simultaneously entered for the offenses of first degree robbery and theft by taking in the third degree. Dunn contends that, under the circumstances of this case, all of the elements involved in his conviction of theft by taking in the third degree were necessarily included in his conviction for the offense of first degree robbery. Dunn thus argues that, pursuant to the Alaska Supreme Court's ruling in *Whitton v. State,* 479 P.2d 302 (Alaska 1970), the imposition of separate sentences on the theft and robbery charges was precluded by double jeopardy.

On appeal, the state has confessed error as to this issue and has requested that the judgment and commitment entered as to the lesser offense of theft be vacated upon remand to the superior court. Upon conducting an independent review, we have determined that the record in this case supports the error confessed by the state and that the confession of error has legal foundation. *Marks v. State,* 496 P.2d 66, 67–68 (Alaska 1972). Remand of this case to permit the superior court to vacate the judgment entered for the offense of theft by taking in the third degree appears to be the appropriate remedy. *See Tuckfield v. State,* 621 P.2d 1350, 1352–53 (Alaska 1981); *Robinson v. State,* 484 P.2d 686 (Alaska 1971). Accordingly, the case will be remanded for this purpose.

## IX. SENTENCING

The remaining issues raised by Dunn pertain to the appropriateness of the procedures used by the trial court in imposing the sentences for Dunn's offenses and the question whether the sentences imposed were too severe. As we have previously stated, Dunn received an aggregate sentence of fifteen years to serve for the charges stemming from the robbery and shooting of February 5, 1980; he received an additional presumptive sentence of six years, consecutively imposed, upon his conviction for the robbery occurring on January 16, 1980.[16] We conclude that it is necessary to remand Dunn's cases for resentencing because the sentences originally imposed were not entered in compliance with applicable law.

In late July 1980, Dunn was convicted of the charges arising from the robbery and shooting of February 5, 1980. He was sentenced on September 11, 1980. Because Dunn used a firearm in the commission of the robbery and the assault, he was subject to presumptive sentences of six years' imprisonment for each offense, despite the fact that he had never previously been convicted of a felony. AS 12.55.125(c)(1).

As the state points out in its brief, Dunn's case was apparently one of the first cases to proceed through trial, conviction, and sentencing under the newly applicable Alaska Revised Criminal Code and the presumptive sentencing provisions contained therein. Specific procedures for the handling of cases involving presumptive sentencing were developed shortly prior to Dunn's sentencing, and accordingly, there seems to have been considerable confusion as to the correct procedures to follow in this case.

The sequence of events that is particularly relevant to this case occurred as follows: On August 15, 1980, several weeks after Dunn's conviction, the state filed a "Notice of Presumptive Sentencing" indicating that, by virtue of Dunn's use of a firearm, he was subject to presumptive sentencing under AS 12.55.125(c)(1) for the offenses of assault and robbery. The state further al-

---

**16.** Dunn entered a guilty plea to Count 1 of his original indictment, which charged the January 16, 1980, liquor store robbery, after he had been convicted and sentenced for the offenses stemming from the events of February 5, 1980. He was thus sentenced for his first robbery after having been sentenced for the second.

leged that two statutory aggravating factors applied to the assault charge, thus authorizing the court to increase the six-year presumptive term provided for that offense. Specifically, the state alleged that Dunn's assault was aggravated because his victim was incapable of resistance (AS 12.55.-155(c)(5)) and because the assault was knowingly directed at a law enforcement officer (AS 12.55.155(c)(13)). On August 29, 1980, the presiding judge for the Third Judicial District, Anchorage, entered a standing order that established, for the first time, detailed procedures to be followed by sentencing courts in cases involving presumptive sentences.[17] The order provided, *inter alia,* for written notice by the prosecution in advance of a sentencing hearing in any case where presumptive sentencing applied and aggravating circumstances were alleged. The order further required a presentence hearing to resolve factual disputes concerning the existence of aggravating factors; a formal order setting forth any aggravating circumstances established was required to be issued upon completion of the presentence hearing, with a copy of the order to be supplied to the Division of Corrections for use in preparation of a presentence report. Additionally, the standing order indicated that a "short form" presentence report could be ordered by the court in any presumptive sentencing case if no aggravating or mitigating factors applied.

On September 2, 1980, Dunn's counsel filed an "Opposition to the State's Notice of Aggravating Factors." The opposition was expressly based on the lack of compliance with the newly promulgated procedures for imposition of presumptive sentences. The opposition specifically objected to consideration of aggravating factors in the absence of a presentence hearing, and it noted that, apparently because of the state's failure to file a notice of presumptive sentencing within ten days after Dunn's conviction, only a "short form" presentence report was being prepared for the court, on the assumption that the presumptive sentence of six years would be imposed. The opposition filed on behalf of Dunn also contended that the state had failed to meet its burden of factually establishing the applicability of one of the aggravating factors it alleged—that Dunn's assault was directed at a victim who was vulnerable or incapable of resistance.

Notwithstanding the objections raised in Dunn's opposition to the state's notice of presumptive sentencing, no presentence hearing was set by the court to determine the existence of the aggravating factors alleged by the state; nor did the court enter an express order or finding, either prior to or at the sentencing hearing, as to the aggravating factor or factors that it found to have been established and relied upon in sentencing. Dunn's sentencing hearing for the robbery and shooting of February 5, 1980, was held on September 11, 1980, as originally scheduled. Dunn received a presumptive six-year term for the offense of robbery, but was sentenced consecutively to an aggravated term of nine years for the charge of assault. At the time of imposing sentence, the court had been supplied by the Division of Corrections with a "short form" presentence report consisting of only two typewritten pages.

Approximately two months later, Dunn was sentenced on his plea of guilty to the prior liquor store robbery of January 16, 1980. He received a presumptive six-year sentence for this offense, but all six years were imposed consecutively to the fifteen year total sentence for the robbery and assault of February 5, 1980. At the time of the second sentence, the court still had before it only the "short form" presentence report submitted with respect to the previous convictions.

 Given this background, Dunn initially maintains that, in the absence of a presentence hearing to permit resolution of disputed facts pertaining to alleged aggravating factors, and further, in the absence

of express findings by the sentencing court as to the existence of aggravating factors, the three-year increase of the presumptive six-year term specified for his assault conviction cannot be sustained. We agree.

Dunn conceded the fact that he was subject to presumptive sentencing under AS 12.55.125(c)(1). He further failed to contest, in his written opposition, the state's claim that his assault conviction was subject to aggravated sentencing, pursuant to AS 12.55.155(c)(13), because his attack was knowingly directed at a law enforcement officer. To this extent, we believe that Dunn has waived the right to a presentence factual determination as to whether presumptive sentencing applied to his assault and robbery charges and whether the aggravating factor specified in AS 12.55.155(c)(13) had been established.

Nevertheless, the lack of any express finding by the sentencing court as to the aggravating factors that were actually considered in imposing a nine-year sentence on the assault charge requires us to remand for resentencing in order to permit specific findings as to aggravation to be made. Without express findings as to aggravating factors, we have no way of knowing whether and to what extent the court's decision to impose an aggravated nine-year sentence was based upon consideration of the aggravating factor that was expressly contested by Dunn, as to which no hearing was held. Although, as the state correctly notes, the procedures specified in the presiding judge's standing order of August 29 were not applicable at the time of Dunn's conviction or when the state filed its Notice of Presumptive Sentencing, these provisions took effect well in advance of Dunn's sentencing date. Under the terms of the standing order, a hearing for the resolution of any factual dispute concerning the contested aggravating factor was clearly mandated. Even assuming that the standing order of August 29, 1980, had not been in effect, we believe

that fundamental fairness would require that Dunn be afforded an opportunity to be heard on the applicability of the contested aggravating factor prior to sentencing.

Moreover, the trial court's duty of making specific findings as to the existence of aggravating factors existed independently of the standing order of August 29, 1980. The provisions of AS 12.55.155(f) unequivocally required the court to "set out with specificity" all findings with respect to aggravating and mitigating factors. See generally Juneby v. State, 641 P.2d 823, 835–40 (Alaska App.1982). Our inability to discern, based upon the sentencing record, to what extent, if any, the sentencing court, in imposing Dunn's nine-year sentence for assault, relied upon an aggravating factor that had not adequately been addressed or ruled upon requires that Dunn's sentence for assault be vacated.[18]

The apparent misunderstanding by the Division of Corrections concerning the appropriate form of presentence report to prepare for use by the court in sentencing poses a separate problem affecting the validity of the nine-year aggravated term imposed for Dunn's conviction of assault. Additionally, we believe that the preparation of a limited "short form" presentence report for the court mandates reconsideration of the consecutive sentences imposed on Dunn.

Alaska Criminal Rule 32(c)(1) expressly requires preparation of a presentence report for use by the court in all felony cases. See, e.g., Adams v. State, 521 P.2d 516, 518 n. 3 (Alaska 1974). The requirements contained in Criminal Rule 32(c)(2) provide a broad statement of the desirable scope and content of presentence reports. Beyond the somewhat general provisions of Criminal Rule 32(c)(2), the Alaska Supreme Court has made clear its approval of more specific and detailed standards governing the con-

---

**18.** The only statement by the sentencing court that could be construed as a reference to an aggravating factor justifying the increased sentence of nine years for assault that was actually imposed is an implicit reference contained in the court's comment that the consecutive nine-year sentence for assault would "be an effective deterrent to anyone who takes a handgun and shoots a police officer."

tents of presentence reports. *See Sandvik v. State,* 564 P.2d 20, 22–23 & n. 4 (Alaska 1977) (citing with approval ABA Standards Relating to Probation 2.3 (1970)). While the standing order issued by the presiding judge of the Third Judicial District on August 29, 1980, carved out a limited provision for abbreviated presentence reports in cases involving presumptive sentencing where no aggravating or mitigating factors existed, it is apparent that the exception could not logically be extended to this case.

The August 29, 1980, standing order authorized use of a truncated presentence report only upon the express order of the sentencing court. No such order was issued in this case. More significantly, it is evident that the aim of the provision authorizing use of a "short form" presentence report was to save time and effort in cases where, by virtue of the application of presumptive sentencing, the sentence that a defendant would receive was predictable and no judicial discretion would be involved in its imposition. On its face, the standing order with respect to "short form" presentence reports cannot be deemed to have applied to Dunn's assault charge, where aggravating factors were alleged and the court's discretion came into play in the imposition of sentence. For the same reason, we believe that the presence of multiple counts, coupled with the court's discretionary authority to impose the multiple sentences concurrently, partially consecutively, or entirely consecutively, mandated the preparation of a full presentence report before a sentence could meaningfully be imposed.

We decline to accept the state's invitation to hold that the lack of a presentence report was rendered harmless in this case by the ability of Dunn's counsel to bring matters favorable to the defense to the attention of the court at the time of sentencing. Exercise by the court of its discretion in imposing a particular sentence is a matter of utmost concern and importance, both to the defendant and to society in general. Discretionary sentencing decisions, especially in more serious felonies such as involved in the case at bar, should be made on the basis of the best available information concerning not only the offense involved but also the offender and his background. The chief function of the presentence report is to provide the court with a thoughtful, well-balanced, and unbiased evaluation of all relevant circumstances concerning both the offender and the offense at hand, based upon independent investigation. We do not believe it fair to posit that the representations of defense counsel on behalf of his client in the adversary context of a sentencing proceeding can provide an adequate substitute for a properly prepared presentence report.[19]

We hold that the trial court's order imposing Dunn's sentences consecutively must be vacated for preparation of a full presentence report. The superior court shall also conduct a hearing to determine whether the aggravating factor set forth in AS 12.55.155(c)(5) can be established by the state by clear and convincing evidence with respect to Dunn's conviction of first degree assault; the court's findings with respect to this aggravating factor shall be specifically set forth on the record. Upon preparation

**19.** We specifically note that Dunn's conviction and sentence for the January 16, 1980, robbery were based on a plea of guilty and that, in sentencing Dunn to a consecutive, presumptive term of six years for the January 16 robbery, the sentencing judge had available to him only the "short form" presentence report initially prepared with respect to the February 5, 1980, robbery and assault. While it might be arguable that the judge had adequate information concerning Dunn's crimes of February 5, 1980, because a jury trial had been held as to those charges, the January 16, 1980, robbery was a

separate and unrelated incident as to which the court had sketchy information, at best.

It is significant that ABA Standard 2.3, relied upon by the court in *Sandvik v. State,* 564 P.2d 20, 22–23 (Alaska 1977), recommends that a presentence report should include, in addition to information concerning the offender and his background,

a complete description of the offense and the circumstances surrounding it, not limited to aspects developed for the record as part of the determination of guilt.

of the presentence report [20] and completion of the hearing with respect to the aggravating factor alleged by the state, additional sentencing proceedings should be conducted by the superior court to determine an appropriate sentence for Dunn's conviction of first degree assault and, further, to reconsider the issue whether and to what extent the sentences received by Dunn for his two counts of robbery and one count of assault should be consecutively imposed.[21]

The convictions entered by the superior court are AFFIRMED, and this case is REMANDED to the superior court for additional sentencing proceedings consistent herewith.

---

**20.** Dunn argues, as a separate point, that a psychiatric report should have been ordered by the court prior to sentencing in light of Dunn's youth, his lack of a prior record, and the seriousness of the crimes for which he was convicted. We need not address this contention on its merits, since Dunn will, on remand, be capable of requesting a psychiatric evaluation before he is resentenced. Any such request by Dunn should be honored by the sentencing court.

**21.** Our resolution of the sentencing issues on procedural grounds makes it unnecessary to reach Dunn's argument that the aggregate sentence he received was excessive. We express no view concerning the appropriateness of consecutive sentencing in this case, and our disposition based on procedural grounds should not be construed as either encouraging or discouraging the sentencing court in considering the option of reimposing consecutive sentences, in whole or in part, upon resentencing. In the event that the sentencing court determines that consecutive sentences should again be imposed, however, the court should make appropriate findings, on the record, in accordance with the requirements of *Lacquement v. State,* 644 P.2d 856 (Alaska App.1982).