Patrick L. SHORTY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9942.

Court of Appeals of Alaska.

Aug. 7, 2009.

Doug Miller, Assistant Public Advocate, and Joshua Fink and Rachel Levitt, Public Advocates, Anchorage, for the Appellant.

Tamara E. de Lucia and Kenneth M. Rosenstein, Assistant Attorneys General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

### OPINION

BOLGER, Judge.

Patrick L. Shorty appeals his convictions for sexual assault in the first degree and three related misdemeanor charges. He argues that he could not be arrested without a warrant, and argues in the alternative that his arrest was not supported by probable cause. We hold that the police did not need an arrest warrant before arresting Shorty for a felony, and we conclude that there was probable cause for Shorty's arrest.

We also conclude that the trial judge properly joined the sexual assault charge with the misdemeanor charges that developed when Shorty was arrested, and that there was sufficient evidence to support Shorty's convictions for resisting arrest and fourth-degree assault. But we reverse Shorty's conviction for providing false information to a peace officer because we conclude that the trial judge improperly allowed the prosecution to substantively amend that charge at the conclusion of the trial.

### Background

On July 8, 2003, a young woman named B.A. encountered three men at the Anchorage Transit Center. After a brief conversation, the four began walking together towards the Carrs store at 13th Avenue and Gambell Street. As they walked through a vacant field, one of the men tripped B.A. and took her backpack. A younger man then held B.A. down while an older man raped her and repeatedly punched her in the face. The younger man raped B.A. after the older man had finished. The third man then alerted his companions that police were nearby, and the three men quickly fled on foot. Shortly afterwards, B.A. ran to a nearby patrol car and flagged down Officer Leonard Torres for help.

Officer Torres saw three men running from the scene. Chasing them down, Torres apprehended Thomas Leichty, whom B.A. identified as one of the three men who assaulted her. Leichty later told another officer that he could not remember his role in the assault because he was intoxicated. However, Leichty did recall that his friend— a man he knew as "Shorty"—had sexually assaulted B.A. Leichty also mentioned that he had been in prison with Shorty; using this information, officers were able to get the name of Patrick Leo Shorty from the Tundra Correctional Center.

After receiving Shorty's name, Detective Kenneth D. McCoy showed B.A. a photo lineup of suspects. B.A. chose two photos from the lineup, one of which was of Shorty. Proceeding on Leichty's statement, B.A.'s description of the crime, and her tentative identification of Shorty, McCoy applied for and obtained a search warrant for Shorty's DNA, clothing, and other biological material on July 16, 2003. This warrant was good for ten days. McCoy also had the police dispatchers issue a "stop-and-hold locate" directive, ask-

ing any law enforcement officials who contacted Shorty to detain him so that McCoy could execute the search warrant.

On July 26, 2003, the tenth day after the search warrant was issued, the police dispatcher received an anonymous tip that Shorty was near 10th Avenue and Ingra Street wearing a green trench coat. Officers Gregory Witte and Andy Cottle separately responded to the resulting dispatch. Witte responded first and found a man matching the description given by the dispatcher. Witte approached the suspect and asked the man to identify himself, and he responded that his name was "Harold Gregory." He initially said that he was born in July 1969, then said that he was actually born in 1968, and later suggested that his birthday was actually in August. He also did not know his social security number.

Witte attempted to confirm this information with the Alaska Public Safety Information Network database, but the name "Harold Gregory" registered no matches. At the same time, both Witte and Cottle also believed that the suspect was preparing to flee. When Witte then confronted the suspect about his inconsistent birthdays, he stopped talking. At that point, Witte decided to arrest the man—who was in fact Patrick Shorty.

The officers began to grab Shorty's arms, but he pulled the officers into a nearby alley. The officers took Shorty to the ground, and Cottle attempted to control Shorty's head while Witte tried to control Shorty's arms. During the melee, Cottle applied a vascular restraint that momentarily rendered Shorty unconscious; when he regained consciousness, he quickly resumed fighting. When Officer Christopher Ritala arrived, however, the three police officers were able to secure Shorty.

At the police station, Shorty detailed his account of the assault to Detective McCoy. According to Shorty, he could not remember his exact role because he was intoxicated, but did remember that Leichty had sex with B.A.

McCoy then obtained a new search warrant authorizing collection of Shorty's DNA because he believed that the previous warrant had expired. After obtaining samples from both Shorty and Leichty, the police compared them to an original DNA swab taken from B.A. The results showed that Shorty was almost certainly the source of the sperm sample contained in the swab from B.A. The results also indicated that Shorty was the likely source of a sperm sample contained in a penile swab taken from Leichty.

Shorty was then charged with two counts of first-degree sexual assault,[1] one count of resisting arrest,[2] one count of fourth-degree assault,[3] and one count of providing false information to a peace officer.[4] Prior to trial, he filed a motion to suppress all of the evidence stemming from his arrest—arguing that he was detained and arrested without a warrant and without probable cause. After two evidentiary hearings, Superior Court Judge Michael L. Wolverton ruled that the officers had probable cause to arrest Shorty and that no arrest warrant was needed.

Judge Wolverton also denied Shorty's motions to sever the charges for separate trials, to dismiss the indictment, and alternative motions asking the court to dismiss the misdemeanor charges or require a bill of particulars. But the judge granted Shorty's motion to suppress the statement he made to Detective McCoy following his arrest because he concluded that the statement had been coerced by McCoy's threat of harsher treatment.[5]

Shorty was convicted on all charges after a jury trial, and sentenced to a composite term of imprisonment of 31 years and 30 days. Shorty now appeals to this court.

---

1. Counts III and IV—AS 11.41.410(a)(1); AS 11.16.110.

2. Count V—AS 11.56.700(a)(1).

3. Count VI—AS 11.41.230(a)(1).

4. Count VII—AS 11.56.800(a)(1).

5. *See Beavers v. State,* 998 P.2d 1040, 1046–48 (Alaska 2000).

### No Warrant is Required for a Felony Arrest

■ Shorty argues that we should construe the Alaska Constitution to require the police to obtain a warrant before making a felony arrest unless there are exigent circumstances that require immediate action.[6] Shorty's argument is directly contrary to AS 12.25.030(3), which authorizes a peace officer to arrest a person without a warrant "when a felony has in fact been committed, and the person making the arrest has reasonable cause for believing the person to have committed it." As we explained in *McCoy v. State*, under this statute, "a peace officer, without a warrant, may arrest a person for a felony when the officer has probable cause to believe that a felony has been committed and probable cause to believe that the person committed it."[7]

Alaska Statute 12.25.030(3) codifies "the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a ... felony not committed in his presence if there was reasonable ground for making the arrest,"[8] and is consistent with similar federal statutes enacted since the Second Congress in 1792.[9] In construing the Fourth Amendment, the United States Supreme Court has approved of peace officers having authority to make warrantless felony arrests based on probable cause—even if they have an adequate opportunity to obtain a warrant.[10]

■ Statutory enactments carry a presumption of constitutionality: "A party raising a constitutional challenge to a statute bears the burden of demonstrating the constitutional violation."[11] And when a party claims that our state constitution should be interpreted differently than its federal counterpart, the party must "point this court to something in the text, context, or history of the Alaska Constitution which justifies this divergent interpretation."[12]

■ Shorty has not pointed to anything in the text, context, or history of the Alaska Constitution suggesting why it should be interpreted differently than the Federal Constitution on this issue. Indeed, there is substantial evidence to the contrary: Alaska law has been consistent with the common-law felony-arrest rule since long before statehood.[13] Shorty has presented nothing to suggest that the Alaska Constitution was intended to abrogate this long standing rule.

We therefore conclude that AS 12.25.030(3) is constitutional: Felony arrests based on probable cause *can* be made without a warrant. Accordingly, we now analyze whether the police had probable cause to arrest Shorty.

### The Police Had Probable Cause to Arrest Shorty for Sexual Assault

■ A police officer has probable cause to arrest a suspect when "the facts and circumstances known to the officer would support a reasonable belief that" the suspect has committed a criminal offense.[14] Probable

---

**6.** *Cf. Campos v. State*, 117 N.M. 155, 870 P.2d 117, 121 (1994) ("Thus, our constitution and case law lead us to hold that for a warrantless arrest to be reasonable the arresting office must show that the officer had probable cause to believe that the person arrested had committed or was about to commit a felony and some exigency existed that precluded the officer from securing a warrant.").

**7.** 491 P.2d 127, 130 (Alaska 1971).

**8.** *United States v. Watson*, 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976).

**9.** *See id.* at 420–21, 96 S.Ct. at 826.

**10.** *See id.* at 423–24, 96 S.Ct. at 828.

**11.** *Baxley v. State*, 958 P.2d 422, 428 (Alaska 1998).

**12.** *Mitchell v. State*, 818 P.2d 1163, 1165 (Alaska App.1991).

**13.** *See* § 290, pt. II Carter's Annotated Alaska Code (1900). Moreover, the rule in Carter's Code was based on the *Code of Criminal Procedure*, ch. XXXVI, § 370 at 505 (1864), *codified in* General Laws of Oregon, ch. XXXVI, § 370 (Deady and Lane 1843–1872), which states that "[a] peace officer may, without a warrant, arrest a person ... [w]hen a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it."

**14.** *State v. Joubert*, 20 P.3d 1115, 1118–19 (Alaska 2001).

cause "requires only a fair probability or substantial chance of criminal activity, not an actual showing that such activity occurred." [15] We review the record independently when we decide whether a particular arrest is supported by probable cause.

■ Detective McCoy obtained statements from B.A. and Thomas Leichty. B.A. stated that she had been raped by two men, and Leichty confirmed that B.A. had been raped by his companion named "Shorty," whom he had met in jail. Leichty's statement identifying Shorty was corroborated by the details of B.A.'s statement, her tentative identification of Shorty's photo, and the correctional facility report that Leichty and Shorty were incarcerated together in the past.[16] This evidence established a fair probability that Shorty had committed the crime of sexual assault. McCoy had thus developed probable cause by the time he issued the directive requesting other officers to "locate and hold" Patrick Shorty.

In addition, McCoy's determination was supported by a neutral judicial determination. McCoy applied for a search warrant to take physical samples from Shorty based on the statements of B.A. and Leichty—the same statements that supported his "locate and hold" directive. The judge who reviewed McCoy's application found probable cause to believe that the DNA samples taken from Shorty would contain evidence of the crime of sexual assault in the first degree. And this was essentially a judicial finding that there was probable cause to believe that

Shorty had participated in the sexual assault of B.A.

For these reasons, we affirm Judge Wolverton's conclusion that the police had probable cause to arrest Shorty when they detained him on July 26th.

### Officers Witte and Cottle Had a Reasonable Belief That the Person They Detained Was Patrick Shorty

■ The two officers who stopped Patrick Shorty on July 26, Witte and Cottle, knew from previous briefings that Shorty was a Native man who was a suspect in a recent sexual assault. They were dispatched to 10th Avenue and Ingra street based on an anonymous tip that Shorty was near that intersection and wearing a green coat and backpack. And when the officers arrived, Shorty was the only person matching this description.

Simply put, Witte and Cottle were justified in arresting the man in the green coat if they had reason to believe that this man was Patrick Shorty.[17] The officers were entitled to rely on the totality of the information they had at the time of the arrest, even though the individual clues (such as the anonymous tip [18] and the absence of an APSIN record for "Harold Gregory" [19]) would be insufficient to establish probable cause if analyzed separately.[20]

In a similar case from the Tenth Circuit Court of Appeals, a Kansas police officer had an arrest warrant for a man named Gavin Allen.[21] The officer received an anonymous

---

**15.** *Id.* (citation omitted).

**16.** *See Merrill v. State,* 457 P.2d 231, 234 (Alaska 1969), *overruled on other grounds by Donnelly v. State,* 516 P.2d 396, 399 n. 6 (Alaska 1973) (finding that there was probable cause to arrest a suspect based on his identification by an accomplice).

**17.** *Cf. Hill v. California,* 401 U.S. 797, 802–04, 91 S.Ct. 1106, 1110–11, 28 L.Ed.2d 484 (1971) (holding that in a situation where the police have probable cause to arrest one party, and reasonably mistake a second party for that first party, the arrest of the second party is still a valid arrest).

**18.** *See Carter v. State,* 910 P.2d 619, 626 (Alaska App.1996) (noting that unverified anonymous tips are insufficient to establish probable cause).

**19.** *See Erickson v. State,* 141 P.3d 356, 359–60 (Alaska App.2006) (concluding that the mere absence of someone's name in the APSIN database does not establish probable cause).

**20.** *See Dunn v. Alaska,* 653 P.2d 1071, 1079 (Alaska App.1982) ("Although it might be true ... that various factors, if taken individually, are as readily consistent with innocence as guilt, we believe that the main point to be made is that the factors did not occur individually, and in isolation from each other.").

**21.** *See United States v. Allen,* 235 F.3d 482, 487–88 (10th Cir.2000).

tip that Allen would be at a certain residence, and found someone at that residence who matched the physical description given by the informant. The suspect said that his name was "Gerald Allen," but then told the officer "that his identification was in *his brother Gerald's* car." [22] The court concluded that, at this point, the officer "could reasonably infer that the defendant was actually Gavin Allen and was simply using the name Gerald as a cover." [23]

In this case, Witte and Cottle likewise had probable cause to believe that the man they were dealing with was Patrick Shorty. They were dispatched to the location because an anonymous caller had reported seeing Shorty there. When they arrived, they found a man matching the descriptions given by McCoy and the caller. When Witte questioned the man about his identity, the man gave answers that reasonably appeared to be false and evasive. As we have already explained, Shorty gave the officers two different years for his birth date (1968 and 1969), as well as two different months, first saying that he was born in July and then saying that his birthday was "next month" (August). Also, Shorty could not give the officers his social security number.

Moreover, Shorty claimed not to have any documentation of his identity, and both officers began to sense that he was preparing to flee, especially after he tried to hand his coat to Officer Cottle. Given all of these circumstances, Witte and Cottle could reasonably conclude that the man they were speaking to was Patrick Shorty. [24] They thus had probable cause to arrest him for sexual assault.

These same circumstances gave the officers probable cause to arrest Shorty for giving false information to a police officer. The officers could reasonable conclude that Shorty had "knowingly give[n] false information to a peace officer concerning [his] identity while ... under ... investigation for a crime...." [25] Accordingly, the officers had two justifications for arresting Shorty. [26]

Given our conclusion that the police had probable cause to arrest Shorty for sexual assault and for furnishing false identifying information, we need not reach another issue presented in this case: Whether the original search warrant authorizing the seizure of biological materials from Shorty had expired by the time he was arrested on the afternoon of July 26.

This warrant was issued on the morning of July 16, and the warrant declared that the seizure was to be conducted "within ten days." Shorty takes the position that the warrant expired exactly 240 hours after it was issued, and thus it had expired by the time the police located him. This position appears to be contrary to case law from other jurisdictions suggesting that the warrant was effective at least until the conclusion of the tenth calendar day. [27] However, because there were independent justifications for Shorty's arrest, we need not decide this particular issue in this case.

***Shorty's Claim that His Arrest was Illegal Because the Officers Failed to Announce the Cause for His Arrest***

▮ Shorty argues we should find that his arrest was illegal because the officers failed to inform him of the "cause of the arrest" as required by AS 12.25.060. But Shorty did not raise this issue in the superior court, and the parties did not litigate exactly what he was told at the time of his detention. Even if the officers' conduct failed to comply with AS 12.25.060, it is not obvious that a violation of this clause of the statute should

---

22. *Id.* at 488.

23. *Id.*

24. *See Dunn*, 653 P.2d at 1079.

25. AS 11.56.800(a)(1)(B)(i).

26. *See, e.g., Snider v. State*, 958 P.2d 1114, 1118 (Alaska App.1998); *State v. Kendall*, 794 P.2d 114, 117 (Alaska App.1990) ("[T]he trial court should analyze the objective information which

the police had at the time when they made an arrest in determining whether there was probable cause to make that arrest.").

27. *See, e.g., United States v. Robinson*, 536 F.3d 874, 877–78 (8th Cir.2008); *Batemon v. United States*, 203 Fed.Appx. 723, 725–26 (7th Cir.2006); *People v. Clayton*, 18 Cal.App.4th 440, 22 Cal. Rptr.2d 371, 374 (1993); *State v. Edwards*, 98 Wis.2d 367, 297 N.W.2d 12, 14 (1980).

require the suppression of probative evidence.[28] We note that, in cases interpreting the analogous "knock and announce" rule, we have held that police officers' failure to inform a resident of the reason for their entry is harmless if that resident was already aware of the reason.[29] We conclude that Shorty failed to preserve this issue for appeal, and at the very least, he has not shown plain error.[30]

### The Grand Jury Heard Sufficient Admissible Evidence to Support the Indictment

Shorty filed a pretrial motion to dismiss the indictment against him—arguing that the prosecutor presented three types of inadmissible evidence to the grand jury: the DNA evidence obtained from Shorty (because the arrest was illegal), Leichty's statement to the police (because it was hearsay), and Shorty's statement to the police (because it was involuntary).

Having concluded that Shorty's arrest was legal, we also conclude that the DNA evidence that was obtained from him after his arrest was properly presented to the grand jury. There is also an argument under Alaska case law that the State had a compelling justification to present Leichty's hearsay statement to the grand jury.[31] But Judge Wolverton did not consider this issue because he concluded that removing Leichty's statement from the grand jury would not vitiate the indictment. However, Judge Wolverton did suppress Shorty's statement to the police, so that statement was also inadmissible at the grand jury proceeding.

We will assume that both Shorty's and Leichty's statements were inadmissible when we analyze their effect on the grand jury's indictment. As we explained in *Stern v. State*, we must determine (1) whether the remaining evidence is sufficient to support the indictment and, if so, (2) whether "the probative force of [the] admissible evidence was so weak and the unfair prejudice engendered by the improper evidence was so strong that it appears likely that the improper evidence was the decisive factor in the grand jury's decision to indict." [32]

The admissible evidence before the grand jury included B.A.'s testimony that she had been raped by a man named Shorty, and the evidence suggesting that Shorty's DNA matched a sample taken from B.A.'s vagina. There is no serious question that this evidence was legally sufficient to support the indictment. Thus, only the second question remains: Whether the probative force of this evidence was so weak that it was likely that the inadmissible evidence was the decisive factor in the grand jury's decision to indict.

The inadmissible statements were indeed probative—each acknowledged Shorty's presence at the scene of the sexual assault. But the DNA evidence proved this point independently, and was substantially stronger. The DNA evidence showed that Shorty's seminal fluids were almost certainly present in B.A.'s vagina, on her jeans, and on Leichty's penis and shirt. This evidence strongly corroborated B.A.'s testimony that she was initially raped by Shorty, and then by Leichty. We therefore conclude that Shorty's and

28. *Cf. Bell v. State*, 668 P.2d 829, 837 (Alaska App.1983) (holding that untimely notice a warrant's execution did not justify the suppression of evidence in the absence of prejudice or bad faith).

29. See *Fleener v. State*, 686 P.2d 730, 735–36 (Alaska App.1984), where this Court found substantial compliance with the knock and announce statute in a case where the police identified themselves, but did not announce their purpose or authority before entering the house to serve a search warrant. Our ruling rested on the trial judge's findings that Fleener was in fact aware of the officers' purpose and authority, even without any announcement: "Fleener knew [that] the police were [coming to] her residence to seize marijuana and that they had now obtained lawful authority to enter." *Id.* at 736.

30. *See Mattox v. State*, 191 P.3d 148, 151 (Alaska App.2008) ("Because Mattox never argued in superior court that his due process rights were violated, he did not preserve this claim for appeal.").

31. *See Galauska v. State*, 527 P.2d 459, 463–66 (Alaska 1974) (noting the fact that a codefendant would probably exercise his right not to testify before the grand jury could be a compelling justification for the admission of codefendant's confession that implicated the defendant).

32. 827 P.2d 442, 445–46 (Alaska App.1992).

Leichty's statements were not the decisive factor in the grand jury's decision to indict.

### Shorty's Various Offenses Were Properly Joined for Trial

Prior to trial, Shorty asked the trial court to sever the sexual assault charges from the misdemeanor charges that stemmed from his arrest (resisting arrest, assault in the fourth degree, and providing false information to a peace officer). In reviewing the trial court's denial of Shorty's request, we first inquire whether the offenses are related in one of the ways authorizing joinder under Alaska Criminal Rule 8(a).[33]

■ Rule 8(a)(3) authorizes joinder of offenses that "are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Criminal transactions may be "connected together" under Rule 8(a)(3) when the State charges that the defendant committed an earlier crime, then committed later crimes to avoid detection or prosecution. For example, in *Phillips v. State*, the defendant committed armed robbery in Anchorage, stole a cab in Palmer, and then killed a state trooper who stopped him as he fled in the direction of Glennallen.[34] In *West v. State*, the defendant barricaded himself in a cabin and set it on fire to avoid arrest for his failure to report to a correctional facility.[35] In *Sharp v. State*, the defendant fled to South Carolina to avoid his trial on sexual abuse charges.[36] Similarly, in *Newcomb v. State*, the defendant escaped from a correctional facility, then shot two police officers as they were attempting to arrest him five month later.[37] In each of these cases we held that the crimes were sufficiently connected to justify joinder under this subsection.

■ The rationale for joinder in Shorty's case is similar. The evidence that Shorty committed a sexual assault was relevant to show that he had a motive for giving false information, resisting arrest, and assaulting an officer when the officers approached him eighteen days later. And the evidence that Shorty gave a false name and attempted to avoid his arrest was correspondingly relevant to show that he had guilty knowledge of the sexual assault. In other words, these two sets of offenses were sufficiently "connected together" to justify joinder under Criminal Rule 8(a)(3).

■ We next must determine whether the trial court was required to sever the charges under Alaska Criminal Rule 14, which allows for relief from prejudicial joinder. But "[i]f the evidence would be cross-admissible if tried separately, the defendant is hard-pressed to show actual prejudice from the failure to sever, since the evidence would have been admitted even if the judge had granted separate trials."[38] As noted above, the evidence of the sexual assault would be relevant to show Shorty's motive for avoiding arrest, and the evidence that he tried to avoid his arrest would be relevant to show that he had committed the sexual assault. Moreover, Shorty did not suffer any prejudice based on the joinder of these offenses, and Judge Wolverton thus did not abuse his discretion when he denied Shorty's motion to sever.

### Sufficient Evidence Supported Shorty's Conviction for Resisting Arrest

■ At the close of evidence, Shorty moved for a judgment of acquittal on the resisting arrest charge, but this motion was denied. Shorty now argues that there was insufficient evidence that he knew he was under arrest and that he used force to resist arrest. To address this argument, we view the evidence presented, and the reasonable inferences from that evidence, in the light

---

**33.** *See Pease v. State,* 54 P.3d 316, 322 (Alaska App.2002).

**34.** 70 P.3d 1128, 1132–34 (Alaska App.2003).

**35.** 923 P.2d 110, 112–13 (Alaska App.1996).

**36.** 837 P.2d 718, 722–25 (Alaska App.1992).

**37.** 800 P.2d 935, 942–43 (Alaska App.1990). *See also Maynard v. State,* 652 P.2d 489, 491 (Alaska App.1982) ("Here all charges grew out of a related series of events, and the trial court could well have anticipated that much of the evidence offered in support of one count would be relevant to the others.").

**38.** *Pease,* 54 P.3d at 322.

most favorable to upholding the jury's verdict. We consider whether a fair-minded juror exercising reasonable judgment could conclude that the State met its burden of proving guilt beyond a reasonable doubt.[39]

Alaska Statute 11.56.700(a)(1) provides: "A person commits the crime of resisting or interfering with arrest if, knowing that a peace officer is making an arrest [and] with the intent of preventing the officer from making the arrest, the person resists ... arrest ... by force...." Under this statute, it is not always necessary for the State to prove that a person was explicitly told that he was under arrest, but the State must prove that the defendant was aware that the officer was making an arrest.[40]

In the instant case, there was substantial evidence suggesting that Shorty knew he was being placed under arrest. Shorty gave Officer Witte a false name and false birthdays when the officer first approached. Then Shorty appeared to make preparations to flee or fight as he tried to hand his coat to Officer Cottle. This behavior suggested that Shorty knew that he was under investigation for a crime even before the officers laid their hands on him.

Indeed, Shorty began to resist the officers quite violently when they tried to handcuff his second hand. Accordingly, viewing the record in the light most favorable to the State, the jury could have reasonably inferred that Shorty knew that the officers were making an arrest.

There is also substantial evidence that Shorty resisted his arrest by force. "Force" is defined by statute to mean "any bodily impact, restraint, or confinement or the threat of imminent bodily impact, restraint, or confinement."[41] At trial, Officer Witte testified that when he and Cottle attempted to arrest Shorty, Shorty "pulled [them] a good ten to twelve feet into the alley and began to struggle." The officers then "took him to the ground" where "he landed on all fours." While Witte had one of Shorty's hands, Shorty used his other hand to grab Cottle's hands and fingers. Cottle then applied a vascular restraint, rendering Shorty momentarily unconscious. When Shorty regained consciousness, he immediately started fighting and grabbing for the officers' hands, "trying to do damage ... so that ... he could get away." When Officer Ritala arrived, the three were able to restrain Shorty and secure him in handcuffs and hobbles.

Based on these accounts, we conclude that there was ample evidence to support Shorty's conviction for resisting arrest.

### Sufficient Evidence Also Supported Shorty's Conviction for Assault

At the close of evidence, Shorty also moved for a judgment of acquittal on the charge of assault in the fourth degree. This charge was based on the allegation that Officer Cottle suffered injury to his knee during the struggle in arresting Shorty. Shorty argued that there was insufficient evidence that he caused the injury to Cottle's knee.

Alaska Statute 11.41.230(a)(1) provides: "A person commits the crime of assault in the fourth degree if that person recklessly causes physical injury to another person...." A person acts "recklessly" "when the person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur...."[42]

At trial, Officer Cottle testified that he injured his knee while trying to arrest Shorty. According to Cottle's testimony, he applied several knee strikes to Shorty's midsection and was wrestling Shorty on the ground, and as a result received injuries that required medical attention. Cottle testified that he would not have used the knee strikes if Shorty had not been so combative.

Officer Witte characterized Shorty's behavior as "aggressive resistance" and testified that Shorty was attempting to "do damage" so that he could get away from the police. Officer Cottle also characterized Shorty's resistance as violent and testified

**39.** *See Eide v. State,* 168 P.3d 499, 500–01 (Alaska App.2007).

**40.** *See Jones v. State,* 11 P.3d 998, 1001 (Alaska App.2000).

**41.** AS 11.81.900(b)(27).

**42.** AS 11.81.900(a)(3).

that Shorty "just fought." Officer Ritala testified that when he arrived, Shorty was on the ground kicking and actively fighting the other officers.

Based on this testimony, the jury had reasonable grounds to infer that Cottle sustained his knee injury while Shorty physically resisted arrest—either through the knee strikes or by contact with the ground—and that Shorty was "aware of and consciously disregard[ed] a substantial and unjustifiable risk" that his struggle would lead to Cottle or one of the other officers suffering this kind of injury.

### Shorty Suffered Prejudice From the Late Amendment of the False Information Charge

Throughout the trial, the State prosecuted the false information charge under AS 11.56.800(a)(1)(A), which criminalizes providing false information "with the intent of implicating another in an offense...." The State's theory apparently was that, when Shorty provided the name "Harold Gregory" to the police, he was attempting to implicate someone named Harold Gregory in the commission of an offense.

At the close of evidence, Shorty moved for a judgment of acquittal on the ground that no one else had been implicated in a crime when he gave the officers the false information. In response, the State then moved to amend the charging statute to AS 11.56.800(a)(1)(B)(i), which criminalizes the act of providing false information while "under arrest, detention, or investigation for a crime." Shorty objected to this proposed amendment, but Judge Wolverton allowed it, finding that there was no prejudice because the evidence presented at Shorty's trial would have been the same under either theory.

Under Alaska Criminal Rule 7(e), a court may permit a charge to be amended before the verdict has been returned if the prosecution satisfies two elements: (1) "no additional or different offense is charged" and (2) "the substantial rights of the defendant [have not been] prejudiced." To succeed on appeal, Shorty must show that the nature or timing of the amendment prejudiced his defense.[43]

Here, the amendment was granted after all of the trial evidence had been presented. In the absence of this amendment, Shorty would have been entitled to a judgment of acquittal, as the State presented no evidence that "Harold Gregory" existed or that Shorty was attempting to implicate this person in the commission of a crime.

More importantly, however, the amendment actually prejudiced Shorty's defense. Shorty defended against the false information charge by contending that "Harold Gregory" was just a made-up name, and that he did not intend to implicate anyone else in a crime. Shorty's attorney cross-examined Officer Witte concerning this issue, and Witte admitted that he did not know whether Harold Gregory actually existed. In addition, before the State moved to amend the charge, Shorty had no incentive to cross-examine the officers about the element that was added by the amendment: Whether he should have known that he was under investigation for a crime when the officers approached him and he gave them a false name.

We acknowledge that the issue of Shorty's knowledge that he was being investigated for a crime overlaps with the issue we resolved concerning the resisting arrest charge—that is, whether Shorty was aware that the officers were trying to arrest him. But the amended false information charge required the State to prove a somewhat more difficult proposition—that Shorty knew that he was under criminal investigation when the officers first approached him and he gave them the false name. We believe that Shorty might have litigated this issue differently if he had known that the State would proceed under subsection (1)(B)(i) of the statute, and we therefore conclude that Shorty was prejudiced by the amendment of the charge.

### Conclusion

We REVERSE Shorty's conviction for giving false information. We AFFIRM the balance of the superior court's judgment.

---

**43.** *See Bowers v. State,* 2 P.3d 1215, 1221 (Alaska 2000).